## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>MALLINCKRODT PLC, *et al.*,<br><br>Debtors. [1] | Chapter 11<br>Case No. 20-12522 (JTD)<br>(Jointly Administered) |
| MALLINCKRODT PLC, *et al.*,<br>Plaintiffs,<br>v.<br>STATE OF CONNECTICUT, *et al.*,<br>Defendants. | Adv. Pr. No. 20-50850 (JTD) |

## OPENING BRIEF IN SUPPORT OF ACTHAR PLAINTIFFS' MOTION TO LIFT PRELIMINARY INJUNCTION

CIARDI CIARDI & ASTIN
HAVILAND HUGHES
THE BEASLEY FIRM, LLC
BARTIMUS, FRICKLETON, ROBERTSON, RADAR PC
MEYERS & FLOWERS, LLC
*Counsel for Acthar Plaintiffs*

Dated: May 18, 2021
Wilmington, Delaware

---

[1] A "complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt."

## TABLE OF CONTENTS

A.    THIS COURT'S RELATED TO JURISDICTION OVER THE ACTHAR PLAINTIFFS'

LITIGATION AGAINST EXPRESS SCRIPTS IS WHOLLY PREMISED ON DEBTORS

MISREPRESENTATION THAT IT HAS A LEGAL OBLIGATION TO INDEMNIFY

EXPRESS SCRIPTS IN THE LITIGATION. ..........................................................................1

B.    EQUITY DEMANDS THAT THE PRELIMINARY INJUNCTION BE SET ASIDE. ........4

    a.    The March 1, 2021 Letter Revealing False Pretenses and False Testimony ....................4

    b.    The Testimony of messrs. Reasons and Welch in Support of the Preliminary Injunction. 7

    c.    The Reason for the Late Disclosure ............................................................................11

        i.    Evidence of Collusion Between Debtors and Express Scripts Entities ........................11

        ii.    Non-Disclosure After Court Inquiry ......................................................................12

        iii.    Collusion and Misleading Testimony Secured Jurisdiction ....................................13

    d.    Summarizing ...............................................................................................................13

II.    FILED PROOFS OF CLAIM NOW DEMONSTRATE THERE IS NO INDEMNITY

OWED, AND THIS COURT MUST VACATE ITS INJUNCTION .......................................14

    a.    The Express Scripts Health/Express Scripts' Proofs of Claim ......................................14

III.    TO THE EXTENT THAT THE COURT IS UNWILLING TO EVALUATE THE

LEGAL MERITS OF THE INDEMNITY CLAIMS, THE REQUIREMENT THAT AN

INJUNCTION BE NARROWLY TAILORED NOW REQUIRES, AT A MINIMUM, THAT

THIS COURT PERMIT ACTHAR PLAINTIFFS' CLAIMS AGAINST UNITED

BIOSOURCE, LLC, TO MOVE FORWARD IN THE DISTRICT COURTS. ..........................15

a.    The Court's Ruling...................................................................................... 15

b.    Triangulation by Express Scripts As To Claims Owned by Distinct Entities................. 15

c.    The Injunction Currently In Force is Vastly Overbroad.................................................. 16

IV.    THE ORIGINAL RATIONALE FOR THE INJUNCTION – THE NEED TO STOP SPENDING MONEY DEFENDING THE ACTHAR LITIGATION – HAS BEEN SHOWN BY LATER EVENTS TO BE AN ATTEMPT TO GAIN A LITIGATION ADVANTAGE........... 17

a.    The Legal Fees Argument............................................................................................ 17

V.    THIS COURT'S RELIANCE ON RECORD TAINT AS A FORM OF IRREPARABLE HARM IS A DENIAL OF DUE PROCESS BECAUSE IRREPARABLE HARM CANNOT BE BASED ON SPECULATION AND CONJECTURE; INJUNCTIONS PROTECT ONLY AGAINST REAL, NOT IMAGINED POTENTIAL FUTURE HARMS ................................ 19

a.    Debtors' Rationale ..................................................................................................... 19

b.    Record Taint is Undefined and Indefinable.................................................................. 20

c.    Undefined Record Taint Is A Violation of Fundamental Due Process........................... 22

d.    Fear of Harm is Not Evidence of Potential Harm........................................................ 23

e.    There Was Never an Existing Threat of Irreparable Harm............................................ 24

VI.    THERE IS NO RISK OF COLLATERAL ESTOPPEL RESULTING FROM PROCEEDING AGAINST EXPRESS SCRIPTS HEALTH, INC. ENTITIES IN THE DISTRICT AND STATE COURTS. ....................................................................................... 25

a.    There No Risk Of Collateral Estoppel........................................................................ 25

b.    No Evidence Supports a Risk of Collateral Estoppel.................................................... 27

c.    Speculation About Irreparable Harm is Not Evidence of Irreparable Harm....................28

d.    Unusual Circumstances Do Not Exist...........................................................................29

e.    Indemnity as Both Sword and Shield...........................................................................29

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases in

this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## REQUEST FOR RELIEF

2.      By this Motion, the Acthar Plaintiffs request this Honorable Court to lift the

preliminary injunction entered December 4, 2020.  Adv. D.I. 180.

## BASIS FOR RELIEF REQUESTED

**A.      THIS COURT'S RELATED TO JURISDICTION OVER THE ACTHAR PLAINTIFFS' LITIGATION AGAINST EXPRESS SCRIPTS IS WHOLLY PREMISED ON DEBTOR'S MISREPRESENTATION THAT IT HAS A LEGAL OBLIGATION TO INDEMNIFY EXPRESS SCRIPTS IN THE LITIGATION.**

3.      This Court based its Section 1334(b) related-to jurisdictional finding "solely on the

existence of potential contractual indemnification claims" against Debtors.  (Trans. 11-23-2020,

46:21-24). This Court reasoned that "[i]t is not for this Court to make an ultimate ruling on the

question of whether ESI indemnity claims will be successful. The question is only whether

potential indemnity claims exist." (Trans. 11/23/2020 46:12-15).

4.      Respectfully, the time has come for this Court to make such "ultimate ruling".

5.      Mallinckrodt's contractual indemnity liability, which serves as the basis for this

Court's finding that it has §1334(b) related-to jurisdiction, required Express Scripts to send

Mallinckrodt a written notice within 20 days of learning of an event that could give rise to

Mallinckrodt's indemnification obligations.  Express Scripts missed this 20-day deadline by over

one thousand days despite being repeatedly named as a Co-Defendant with Mallinckrodt in

multiple lawsuits filed across the country. Apparently, Express Scripts' indemnification amnesia miraculously cleared up just two days after Mallinckrodt filed for bankruptcy protection.

6.      In response to Express Scripts' late notice, Mallinckrodt informed Express Scripts that its indemnification rights had been forfeited because the 20-day deadline had not been met. Unfortunately, the Debtors and Express Scripts did not share this information with the Acthar Plaintiffs.

7.      Even if Express Scripts' indemnity claims could be resuscitated, they will assuredly be barred under §502(e)(1) of the Bankruptcy Code as the following three elements have been met: (i) the debtor and the claimant must be co-liable on the claim; (ii) the claim must be for reimbursement or contribution; and (iii) the claim must be contingent. *In re Pinnacle Brands,* 259 B.R. 46, 55 (Bankr. D. Del. 2001) (disallowing contingent contractual claim for indemnification). Once these three elements are established, disallowance under §502(e)(1)(B) is mandatory. *In re Lyondell Chemical Co*., 442 B.R. 236 (S.D. NY, 2011).

8.      Unsurprisingly, the Debtors' recently submitted Plan of Reorganization confirms that, upon Plan approval, Express Scripts' indemnification claims shall be deemed void and no effect. Doc 2074, p. 68. **As a result, the basis for the preliminary injunction is moot.**

9.      Even without consideration of the Debtors' misrepresentations and omissions, this Court's jurisdiction over non-debtor defendants in the Acthar Plaintiffs' litigation is tenuous.

10.     As set forth in *W.R. Grace & Co*, 591 F.3d 164 (3rd Cir. 2009), a debtor's executory indemnity obligations, by their very nature, cannot be liquidated without the intervention of another lawsuit and consequently do not trigger related-to bankruptcy jurisdiction.

11.     In *W.R. Grace*, the court denied the debtor's request to impose a preliminary injunction

staying litigation against non-debtor defendants who held indemnification claims against the

debtor, reasoning:

> One of the issues on appeal was whether the bankruptcy court had the power to
> enter the injunction as to non-debtors Lummus and Basic. In analyzing that
> question, we repeated that the *Pacor* test, as clarified by *Federal–Mogul [In re
> Federal–Mogul Global, Inc.,* 300 F.3d 368 (3d Cir.2002)], we, requires an inquiry
> into "whether the allegedly related lawsuit would affect the bankruptcy without the
> intervention of yet another lawsuit." We also examined other factors advanced by
> the debtor as grounds for related-to jurisdiction, namely, the alleged unity of
> interest between the debtor and its affiliates based on the debtor's potential
> indemnity obligation to those affiliates, as well as the existence of both a shared
> production site and shared insurance between the debtor and the
> affiliates. https://1.next.westlaw.com/Link/Document/FullText?findType=Y&ser
> Num=2005654407&originatingDoc=I11de9dbcf64211deb08de1b7506ad85b&ref
> Type=RP&originatingContext=document&transitionType=DocumentItem&conte
> xtData=(sc.DocLink) Even when considering those additional elements of unity
> between Combustion Engineering and its non-debtor affiliates, we nevertheless
> held that related-to jurisdiction could not be extended to asbestos claims against
> those non-debtors.

*W.R. Grace, 231-32.*

12.     In *Federal-Mogul*, cited heavily in the *W.R.* Grace opinion, the Third Circuit confirmed the

bankruptcy court's denial of §1334(b) motions to transfer on the basis that it could not exercise

related-to [j]urisdiction over litigation between non-debtors based merely on the prospect that the

non-debtor co-defendant would have an indemnity claim against the debtors.

13.     Citing to *In Pacor, Inc. v. Higgins,* 743 F.2d 984 (3d Cir.1984), the *Federal-Mogul* court

confirmed that executory indemnification claims do not "conceivably" have an effect on a

bankruptcy proceeding because no liability is triggered without the intervention of yet another

lawsuit. The *W.R. Grace* court applied this concept to facts which mirror the case at bar:

> Turning to the facts at hand, the relationship between Grace and the State of
> Montana is in one crucial respect analogous to the relationships in *Pacor, Federal–
> Mogul,* and *Combustion Engineering.* Like the debtors in those cases, Grace will
> not be bound by any judgment against the third party in question. Rather, an entirely

separate action would be necessary for any liability incurred by Montana to have an impact on Grace's estate. Specifically, Montana would first have to be found liable by its state courts and would then have to successfully bring an indemnification or contribution claim against Grace in the Bankruptcy Court. This is precisely the situation in which we have found that related-to jurisdiction does not exist. Indeed, we have stated and restated that, in order for a bankruptcy court to have related-to jurisdiction to enjoin a lawsuit, that lawsuit must "affect the bankruptcy [ ] without the intervention of yet another lawsuit." *Federal–Mogul,* 300 F.3d at 382; *Combustion Eng'g,* 391 F.3d at 232.

*W.R. Grace* at 172-73.

14.    In determining whether to end or modify the Preliminary Injunction, this Court must consider the Debtors' misrepresentations as it relates to the strength of Express Scripts' indemnification claims in light of the related-to jurisdictional threshold established by *Pacor, Federal-Mogul* and *W.R. Grace.*

## B.   EQUITY DEMANDS THAT THE PRELIMINARY INJUNCTION BE SET ASIDE.

### a.   THE MARCH 1, 2021 LETTER REVEALING FALSE PRETENSES AND FALSE TESTIMONY

15.    On March 1, 2021, Counsel for Debtors, Elizabeth Marks, filed a letter with the Court[2]. That letter admitted that Debtors withheld from all parties and failed to disclose to the Court, correspondence sent to and received by Debtors that was highly relevant on the issue of indemnity. As the Court knows, indemnity was the sole jurisdictional basis underlying the preliminary injunction.[3]   The disclosure was withheld at a time when it would likely have made a difference in the outcome of the Preliminary Injunction in this case because it demonstrated that Debtors had

---

[2] See D.I. 209 filed in 20-50850.

[3] This Court based its jurisdictional finding "solely on the existence of potential contractual indemnification claims," against Debtors.  (Transcript of Hearing, 11/23/2020, page 46, lines 21 – 23, *hereafter* "Trans., [date], X:Y")

asserted the indemnity defense, and that the UBC claims filed on November 12, 2020, did not assert the indemnity that Debtors had previously denied.

16.     What was previously unknown to Acthar Plaintiffs at the time of the hearing on the injunction, but revealed by Counsel's letter to the Court and the time records of the Latham firm, is that counsel appears to have engineered Express Scripts' indemnity being asserted in order to secure the injunction, just as this Court had presciently inquired at the hearing. (Transcript, 11-18-20 at 85-87).  In order to place this in the proper context and illustrate the manner and method in which this Court was deceived by Debtors, some description of the testimony before this Court is needed.  As the Court will recall, Acthar Plaintiffs inquired of Mr. Reasons and Mr. Welch in corporate representative depositions about the claimed indemnity.[4]

17.     It is important for the Court to note three things about the Marks letter.  First, it states "It has come to our attention that prior to the ESI Letter, there was an additional indemnification demand *by one ESI Defendant* and a corresponding response by the Debtors…". (D.I. 209).

18.     This assertion is false on two levels.  United BioSource, LLC, is not an "ESI Defendant." Express Scripts sold UBC to Avista Partners in 2017.  The Court will note that the letter Ms. Marks attached comes *not from Express Scripts* on behalf of UBC, but from an entity called ACP Ulysses Buyer, with the same address and signed by the same individual (Jeff Ramage) listed for notice on UBC's unsecured proofs of claim 141 and 139.  Debtors falsely attempt to portray this letter as

---

[4]  This Court foreclosed the same level of inquiry as to Express Scripts which would likely have revealed this information. See this Court's order quashing Acthar Plaintiffs' subpoena to ESI, D.I. 102. The Court was unaware, at the time, of the Skadden Firm's dual representation of both ESI and Debtors, as well as Debtors coordination with ESI to engineer the injunction.  In moving to quash Express Scripts assured this Court that "[t]he Acthar Plaintiffs have sought and obtained discovery in connection with that request for indemnification, including in the form of document requests and depositions—both 30(b)(6) and individual—of Mallinckrodt." (D.I. 72)  Both Mallinckrodt and Express Scripts knew differently.  Surely this Court must wonder how differently it would have ruled had it known the full information Debtors withheld.

5

being transmitted by Express Scripts.  It was not. The secondary claim, that it had only recently "come to [Debtors] attention," is even more troubling.

19.     The letter was sent by Federal Express to the Mallinckrodt <u>Legal Department</u> in June, 2020, only four months prior to the bankruptcy.  The letter, however, was not filed and ignored.  It was answered by the Legal Department in August, 2020, only two months prior to the bankruptcy. The letter was signed by the Associate General Counsel, Legal Investigations & Litigation, Lauren Misztal.  That a highly-placed lawyer sent the letter from the Debtors, on indemnity, just two months prior to bankruptcy, however, is not the end of the story.

20.     Latham & Watkins' billing records indicate that on October 13, 2020, Elizabeth Marks (the same Elizabeth Marks who wrote the "It has come to our attention" letter), Chris Harris (who handled the injunction for Debtors), and A. Yerramalli, all had a conversation with L. Misztal (who wrote the letter telling UBC that its indemnity claim was untimely).  The subject of that meeting was "regarding 105 matters."  Thus, either Misztal did not tell Debtors' lawyers about her letter to UBC at a time when she knew indemnity was directly at issue, or that disclosure was made and its content not disclosed to the Court.  In either circumstance, given Ms. Marks and Ms. Misztal's direct involvement in both the injunction matters and this late disclosure, this is not something that can be explained as a mere oversight.

21.     The second thing to note is Ms. Mark's stark assertion that Debtors "do not believe the additional indemnification request and response would change any of the issues,…".  This statement both strains credulity and ignores the elements of injunctive relief.  This is because of the third and most important feature of the Marks letter, which is the Debtors' response.

22.     Debtors wrote back to UBC almost two months later and ***asserted the very same defenses against indemnity that Acthar Plaintiffs put forward in their responses to the Preliminary***

6

*Injunction*.   Because this correspondence was not disclosed to the Court or the Acthar Plaintiffs, a highly relevant characterization of all these indemnity claims (made earlier in time than the ESI letter) **by the Debtors themselves** calls into question their honest and good faith belief they had any real concern about indemnity, and instead, used indemnity as a cudgel to obtain injunctive relief from this Court[5].

23.    This Court should also note that UBC, as an independent corporate entity with an indemnification claim sent by letter to Debtors, is a scheduled creditor, yet it did not file a Proof of Claim related to indemnity in any of its contracts with Debtors.  It filed two proofs of claim in November, 2020, in its own right (139, 141).  Yet, Express Scripts Health, Inc., *an entity without any ownership interest whatsoever in UBC*, filed a proof of claim asserting *as its own claim*, the purported indemnity rights of UBC that Debtors had already rejected.  Debtors used that assertion, that Debtors had already rejected outright, before this Court as a basis for injunctive relief.  Debtors did so without acknowledging that they had disputed that claim directly.  Express Scripts Health, Inc., without any reference to any assignment, and specifically disclaiming having obtained the claim from another entity, filed proofs of claim asserting this UBC indemnity as its own, again, without reference to UBC's prior assertion and Mallinckrodt's response.  *See, e.g.*, Proofs of Claim 4510 and 4197.

        b.   **THE TESTIMONY OF MESSRS. REASONS AND WELCH IN SUPPORT OF THE PRELIMINARY INJUNCTION**

---

[5] Well before the arrival of the Express Scripts Indemnity Letter (D.I. 18-17) sent on October 14, 2020, Latham & Watkins had reviewed Express Scripts materials and attended a call "regarding ESI defendants and indemnity."  A reasonable inference from this information is that Latham & Watkins requested, and Express Scripts provided, the letter regarding indemnity based on the 10/13/2020 phone call and emails. These emails have still not been identified on a privilege log or otherwise disclosed.

24.     The cloaking of this document was married with the testimony from **two** executives of the

Debtors.  In his deposition Mr. Welch, the Chief Transformation Officer (and former chief of staff

to the CEO) testified:

> 9 Q. Okay.
> 10 Was that, did that come as a
> 11 surprise to the company that Express Scripts was
> 12 claiming indemnification?
> 13 A. I understand that there's been a
> 14 joint defense agreement in place for some time,
> 15 but whether we were surprised by it, I am not
> 16 part of the legal team, so I don't know the
> 17 nature of the discussions with ESI.
>
> ***
>
> 25 Q. So there's been a joint defense
> 1 agreement between the companies, but at no point
> 2 prior to October 14th, to your knowledge, did
> 3 Express Scripts invoke indemnification and alert
> 4 Mallinckrodt that it was exercising its rights
> 5 under those provisions, right?
> 6 A. I'm not aware of any previous
> 7 invocation of claim of those rights.
>
> 6 Q. To the best of your knowledge, as
> 7 you sit here today, the PLC or ARD under those
> 8 contracts has not notified Express Scripts of
> 9 any intent to invoke Mallinckrodt's rights under
> 10 those indemnification provisions, is that fair?
> 11 MR. MURTAGH: Objection.
> 12 A. To the best of my knowledge, they
> 13 have not done that. I would say that that is a
> 14 fair representation, but again it exceeds the
> 15 scope of my knowledge. I'm not aware of whether
> 16 it has or has not been done.
> 17 BY MR. HAVILAND:
> 18 Q. Do you know if there's any
> 19 contemplation at this point within the
> 20 organization to exercise those rights?
> 21 A. I am not aware of that and I have
> 22 not heard of such contemplations.

(Deposition of Welch at 58:9 – 62:22

Then later in the deposition:

7 Now, the debtor has not written back
8 to Express Scripts, right?
9 A. To the best of my knowledge, we have
10 not.
11 Q. Has the debtor or anyone, to your
12 knowledge, and I'll take a "yes" or "no" if it
13 was counsel, that engaged in any way with
14 Express Scripts about their claim of indemnity?
15 A. I don't have any basis of knowledge
16 on that.

Dep. at 159:7-10.

14 Is it the company's view, the
15 debtor's view that Express Scripts has promptly
16 notified it of its claim of indemnification?
17 A. I think consistent with our overall
18 position on this 105 injunction we do not want
19 to litigate with ESI over the nature of
20 promptness.

Dep. at 170:14-20

25.     The testimony by Mr. Welch that he was "not aware" of a prior invocation of indemnity

rights that was sent directly to his Legal Department by Federal Express is misleading. It was sent

on June 8, 2020. It was not responded to until August 17, 2020, meaning that it percolated through

Debtors' corporate offices for more than two months. As the Court will note, Debtors had not only

been notified, they had been **notified in writing, in a document marked for next-day delivery**.

Worse, someone with decision-making authority in the C-suite had directed Mallinckrodt's

lawyers to respond, **in writing, contesting the timeliness** of that indemnity claim – a decision that

took more than two months to make and execute upon. That response was sent by Express Mail.

Clearly, both parties viewed this as a priority matter.

26.     When later asked **directly** about the timeliness issue, Mr. Welch's response was that

Debtors "did not wish to litigate over timeliness," when, as Debtors' letter shows, it had adopted

a litigation position to do exactly that, committed to that position in writing, and sent it to the party claiming indemnity. That entity then failed to file a proof of claim on that issue, apparently believing, as Acthar Plaintiffs had pointed out, that Debtors were correct on the timeliness issue.

27.     Either Mr. Welch was very badly misinformed (which is unlikely for someone with a seven-year tenure with the company, who described himself as the "Hamilton to [Mark Trudeau's] Washington." [Dep. at 15:21]), Mr. Welch suffered a complete lack of memory about a sentinel event prior to bankruptcy, or Mr. Welch committed perjury. That Welch, as the Chief Transformation Officer, or, as the chief of staff to the CEO, would not have been made immediately aware of an indemnity claim by UBC, and either signed off on, or been aware of the corporate response, strains credulity past the point of elasticity. That he would have forgotten about it appears calculated to deceive.

28.     Similarly, Mr. Reasons' testimony on this subject was initially purposefully vague and unhelpful. He fogged a lack of memory about *the entire issue of indemnity* generally. From pages 80 to 87 of his deposition he claims there may have been discussions about indemnity but he cannot recall what entities or persons were involved, or whether the time frame was immediately prior to the bankruptcy, or in the months before. But, like Mr. Welch, his testimony about Debtors' position on the issue is also misleading:

> 4 Q Okay. And just so I'm clear,
> 5 because I know we've kind of gone around it a
> 6 little bit, to your knowledge, there's been no
> 7 communication by any Debtor entity to
> 8 Express Scripts expressing a position on
> 9 indemnification; is that fair?
> 10 A Yes.

Deposition of Reasons at 87:4-10.

29.     As the President of the Debtor, Mr. Reasons, whose name and signature appeared on corporate SEC filing, certainly would have been privy to the letter by UBC, and Debtors' response. There is no question he would have been involved in the decision to respond to the claim in the manner adopted. Both Mr. Reasons and Mr. Welch were corporate representative deponents and their answers bind the Debtors. Their testimony was misleading. These are not the acts of an honest, but unfortunate debtor. They are the machinations of Debtor, hopelessly insolvent, and exploiting this Court's jurisdiction to aid a co-conspirator, in the hope of being able to continue extorting $50,000 for a $40 drug.

### c.   THE REASON FOR THE LATE DISCLOSURE

30.     In effect, Debtors' late disclosure of the truth comes only after Acthar Plaintiffs, in the District Courts, mounted a thorough expository defense to Debtors attempt to transfer the cases against Express Scripts into this Court. Debtors did this by moving to transfer the federal cases, and by removing and then moving to transfer the state case. In so doing, Acthar Plaintiffs were able to show there what they had been unable to demonstrate here: the coordination between Mallinckrodt's counsel and Express Scripts' counsel on the indemnity issue prior to seeking injunctive relief.

#### i.   Evidence of Collusion Between Debtors and Express Scripts Entities

31.     The time records produced by Mallinckrodt's bankruptcy counsel demonstrate that a conference was held on October 13, 2020 – the day after Mallinckrodt filed for bankruptcy – between the lead lawyer for Arnold & Porter in this Court, Laura Shores, and Mallinckrodt's bankruptcy counsel at Latham & Watkins, Attorneys Christopher Harris, Elizabeth Marks and Anu

Yerramalli.[6]   During that conference, counsel for Mallinckrodt discussed the "ESI indemnity"

issue which Latham's lawyer told this Court only came up two days into the bankruptcy.   Time

records (and Marks' late disclosure) demonstrate it came up long before that.   The review of

Latham's time records illustrates why there was no surprise on October 14.   To refresh the Court's

memory:

> MR. HARRIS: …So we don't even need to go into the details of indemnification, but I
> will just briefly respond to a few points.
>
> There were sweeping claims about what allowing indemnification here means. Does it
> mean every single case in which there's indemnification across the country will have to
> be stayed for all debtors? No. We've been focused on these claims and what impact they
> have on us.
>
> That's -- **why haven't we counterclaimed for indemnity? Well, the assertion was just
> brought two days after our bankruptcy, and we have been busy**[7]. The testimony from
> Mr. Welch, there's no deadline for us to respond. We're trying to resolve things
> consensually. There's no need for us to engender a further fight now when we are trying
> our best to reach consensus in this case.
>
> Asked why ESI didn't assert this indemnity claim earlier. I don't know, possibly
> because they were focused on working collaboratively to defend these cases, and
> possibly because they didn't need to assert them yet. And as Your Honor knows,
> often, a bankruptcy filing is what triggers parties to come forward with their claim.
> That's sort of the nature of things like bar dates. So there's nothing surprising that
> has surfaced now, and there's nothing nefarious about it.
>
> THE COURT: Well, could it also have been –
>
> MR. HARRIS: In terms of –
>
> THE COURT: **Could it also have been filed two days after the bankruptcy because
> Express Scripts knew this motion would be coming, and it would give them an
> advantage in getting the stay if they had alleged claims for indemnification?**

---

[6] *See* D.I. 1120-2, reflecting similar entries of Chris Harris (CH), Elizabeth Marks (EM) and Anu
Yerramalli (AY) on October 13, 2020 of conference with Laura Shores about Express Scripts.

[7] It is now more than seven months since the bankruptcy filing, and Debtors have not only failed to
counterclaim, but have failed to file an objection to the Proof of Claim submitted by Express Scripts.
Given the number of lawyers now representing Debtors, that would seem to indicate that they have no
intention to do so.

MR. HARRIS: **That may be, Your Honor. I can't speak for them**. I -- all I can talk about is what the impact is on us. The impact is very, very harmful, there's not real dispute about that in the record.

*ii.   Non-Disclosure After Court Inquiry*

32.     Mr. Harris had an opportunity, in answering the Court, to disclose the existence of the October 13, 2020 conversations and any information communicated by Lauren Misztal on October 13, 2020.  He failed to do so.  This evidence demonstrates indemnity was not a surprise.  A reasonable inference from these facts is that the entire indemnity claim was created by Mallinckrodt and Express Scripts as a means to secure the preliminary injunction.

*iii.   Collusion and Misleading Testimony Secured Jurisdiction*

33.     Knowing now that material information was withheld from the Court and the Acthar Plaintiffs and a preliminary was obtained, the Court must adhere to the dictates of equity that those who seek it, must do it.  The revelations now show that the only proper response here is to lift the injunction because of the way it was secured.

34.     He who seeks equity must do equity, *Freck v. I.R.S.,* 37 F.3d 986 (3rd Cir. 1994); this Court has not seen equity from Debtors. *Dubinsky v. United States*, 44 Fed.Cl. 509, 512–13 (1999) ("[A]n injunction is an equitable remedy, and requires the court to consider whether plaintiff has 'done equity.' "). Had Debtors disclosed either (1) the earlier letter from UBC and Mallinckrodt's response to it; or (2) Debtors' coordination with Express Scripts on the issue of indemnity prior to their "receipt" of the letter, and had this Court been informed of those things, it would likely have questioned the true basis and actual need for an injunction.

d.   SUMMARIZING

35.     Put in stark terms, the indemnity issue was always a trojan horse designed not to secure indemnity for Express Scripts (because none existed, and had already been denied to UBC), but rather to obtain an injunction as a litigation courtesy to its co-conspirators.  To this end Debtors:

- Knew of but did not disclose UBC's prior assertion of indemnity;
- Knew of, but did not disclose that they had opposed that indemnity on the basis of an untimely notification;
- Had its officers give false and misleading testimony before this Court;  See 18 U.S.C. §§ 152(2), (3).
- Had discussions with Express Scripts prior to the assertion of indemnity and did not disclose those discussions to the Court at a time when it would have mattered;
- Failed to correct the evidentiary record;
- Falsely claimed that the late disclosures do not matter.

36.     Debtors and Debtors' co-conspirators have had a long breathing spell courtesy of their failure to be straight with this Court.  Thus, for the foregoing reasons, Acthar Plaintiffs move to vacate the Preliminary Injunction on the basis of mootness, a fraud on the court, the inequitable behavior of Debtors, the absence of a principled basis for jurisdiction for the injunction, and the lack of evidentiary basis for the injunction today.

## II.    FILED PROOFS OF CLAIM NOW DEMONSTRATE THERE IS NO INDEMNITY OWED, AND THIS COURT MUST VACATE ITS INJUNCTION.

### a.    THE EXPRESS SCRIPTS HEALTH/EXPRESS SCRIPTS' PROOFS OF CLAIM

37.     Prior to the bar date, Express Scripts Health, Inc. filed two Proofs of Claim (4510 & 4197) sounding in indemnity.

38.     Acthar Plaintiffs now directly call into question the legal sufficiency and merit of the various entities purported claims of indemnity, as well as the propriety of bundling claims of its

corporate subsidiaries into one Proof of Claim, ignoring the corporate form, and submitting a claim under a contract that no Express Scripts Health, Inc., entity owns[8].

39.     Separately, the Acthar Plaintiffs are challenging and objecting to such Proofs of Claim.

> ### III.    TO THE EXTENT THAT THE COURT IS UNWILLING TO EVALUATE THE LEGAL MERITS OF THE INDEMNITY CLAIMS, THE REQUIREMENT THAT AN INJUNCTION BE NARROWLY TAILORED NOW REQUIRES, AT A MINIMUM, THAT THIS COURT PERMIT ACTHAR PLAINTIFFS' CLAIMS AGAINST UNITED BIOSOURCE, LLC, TO MOVE FORWARD IN THE DISTRICT COURTS
>
> a.    THE COURT'S RULING

40.     In its original bench ruling regarding the injunction, this Court stated "[i]t is not for this Court to make an ultimate ruling on the question of whether ESI indemnity claims will be successful. The question is only whether potential indemnity claims exist." (Trans. 11/23/2020, 46:12-15).

41.     This Court now knows that much of what was presented in the way of testimony appears to be inaccurate[9]. Now, the Court knows that while the Debtors and Express Scripts put before the Court three indemnity contracts in search of an injunction, only two of those asserted rights that properly belonged to individual entities controlled by Express Scripts:  The Exclusive Wholesale Product Purchase Agreement between Debtors and Priority Health Distribution, Inc. and the Pharmacy and Data Services Agreement between Debtors and Accredo Health Group, Inc.

---

[8] United Biosource Corporation, later United BioSource LLC, was sold by Express Scripts Holding Company in 2017 to Avista Partners on or about November 27, 2017.  On January 30, 2020, United Biosource Corp., LLC filed an answer in the Steamfitters Local 420 case which stated, in relevant part, that "UBC …admits that ESHC acquired United BioSource Holdings, Inc. as a subsidiary in 2012 and sold United BioSource Holdings, Inc. in 2017." Thus, while the contracts between UBC and Mallinckrodt plc contain indemnity provisions of questionable validity, Express Scripts Health has no basis whatsoever to claim indemnity for entities it no longer owns or controls, leaving only Priority Healthcare Distribution, Inc, as the sole potentially indemnified entity before the Court for claim 4197.
[9] Acthar Plaintiffs do not believe the testimony was merely inaccurate.  Acthar Plaintiffs believe it was purposefully misleading and offered for the purpose of securing the injunction.

b. Triangulation by Express Scripts As To Claims Owned by Distinct Entities

42.     Debtors and their co-conspirators, Express Scripts, have attempted to create an injunction based on triangulation [10] -- using the assets of the subsidiary to obtain injunctive relief for the parent. They are attempting to bootstrap claims held by separate corporations so as to protect the parent corporation.

43.     Corporate separateness must be respected. *In re HH Liquidation, LLC,* 590 B.R. 211 (Bankr. D. Del. 2018).  The well-established rule is that "parent and subsidiary corporations are separate entities, having separate assets and liabilities...." *Id*.; *In re Regency Holdings (Cayman), Inc.*, 216 B.R. at 375.

44.     In essence, Express Scripts is trying to make a shield out of two corporate entities so as to protect its entire PBM operation.



Figure 2

c. The Injunction Currently In Force is Vastly Overbroad

---

[10] In a recent case involving 11 U.S.C. § 553 the Third Circuit, always mindful of corporate separateness, strictly construed statutory terms and prohibited a creditor parent from setting off its claims through its wholly-owned subsidiary.  *See, e.g.*, *In re Orexigen Therapeutics, Inc.*, -–- F.3d -–- 2021 WL 1046485.

45.     As this Court knows "'injunctive relief should be no broader than necessary to provide full relief to the aggrieved party.'" *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 169–70 (3d Cir.2011) (quoting *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 787 F.2d 875, 888 (3d Cir.1986)).

46.     In *Howmedica Osteonics v. Zimmer Inc.*, 461 Fed.Appx. 192 (3rd Cir. 2012), the Third Circuit reversed the overbroad portion of an injunction in an unfair competition case which restricted a competitor from competing fairly.   In addition, by enjoining the solicitation of the plaintiff's employees by the defendant anywhere in the country, the Third Circuit found the injunction overbroad.

47.     Here, the preliminary injunction issued in this case is similarly overbroad.   The only two entities that are defendants that can legitimately be enjoined are Accredo Health Group, Inc. (AHGI), and Priority Healthcare Distribution, Inc (PHDI).   Those are the only two entities with even potentially valid indemnity agreements because United BioSource is not an Express Scripts entity, and Express Scripts cannot enforce United BioSource LLC's contractual provisions.

48.     Moreover, UBC, having waived any indemnity claim by filing other proofs of claim, but not filing a proof of claim regarding indemnity, must be deemed to have waived such claim, especially where it notified Debtors in 2020 of that claim and was told it was untimely.

49.     Thus, to the extent that this Court does not vacate the injunction outright, it must modify it such that only those two entities (PHDI and AHGI).   Only those entities have indemnity claims, and Debtor could only be aggrieved by those parties. *Ameron, Inc*, 787 F.2d at 888.

50.     For this reason, should the Court be unwilling to vacate the injunction outright, it must modify the injunction such that only those cases against entities in contractual privity with Debtors are enjoined.

IV.     **THE ORIGINAL RATIONALE FOR THE INJUNCTION – THE NEED TO STOP SPENDING MONEY DEFENDING THE ACTHAR LITIGATION –**

**HAS BEEN SHOWN BY LATER EVENTS TO BE AN ATTEMPT TO GAIN A LITIGATION ADVANTAGE**

      a.  THE LEGAL FEES ARGUMENT

51.    Debtors came to this Court complaining that their assets were being drained by virtue of attorneys' fees that were out of control.  The Court will recall in its original filings that Debtors claimed they had spent $76,000,000 in legal fees in the first nine months of 2020.  That averages out to $8,444,444.44 per month in legal fees.

52.    In an affidavit provided to Acthar Plaintiffs, Mr. Eisenberg confessed that Debtors *are currently spending $18,000,000 per month*[11] in professional fees.

53.    To have professional fees more than double **where all litigation is *stayed*** against Debtors under the automatic stay, and actions against co-conspirators are stayed by this Court's injunction is simply difficult to understand. Instead of taking the breathing space afforded by the § 362 stay and their improvidently-granted injunction, the Debtors' have increased the pace of their defense spending.  Indeed, Arnold & Porter has spent hundreds of thousands of dollars preparing for class certification in the Acthar Plaintiffs' cases the Debtors claim would be too costly to litigate. *Compare* D.I. 2164 at ¶ 24 ("If class treatment is litigated and approved, the Debtors' estates will incur substantial fees and costs") *with* D.I. 2290 (A&P Fourth Fee Application, detailing fees incurred in preparing for class certification).

54.    The Court must ask: what was the purpose of the injunction if not to *reduce* spending on these cases so as to preserve the Debtors' limited assets?  What has that doubling of professional fees obtained for the Debtors?

---

[11] Eisenberg Declaration, D.I. 1121, page 10, ¶ 19 ("professional fees in these cases are already accruing at the rate of roughly $18 million per month")

55.    Debtors filed motions to remove and transfer the District Court actions to this Court for the sole purpose of protecting their co-conspirator, Express Scripts Health, Inc.  Debtors removed two cases to federal court, and sought to transfer all the cases to this Court.

56.    This is important because the rationale asserted by Debtors in obtaining the injunction was specifically to avoid the defense of the Acthar litigation in other courts.  They told this Court:

> In short, "[a]llowing the [actions against the non-debtors] will require the Debtors to defend . . . in essence, the very claims they filed bankruptcy to stop through the auspices of the automatic stay.  Such a diversion of resources would retard the administration of the chapter 11 cases by requiring the time and commitment of individuals intimately involved in the chapter 11 cases at this critical time."  W.R. Grace, 386 B.R. at 32.

D.I. 23, Case 20-50850 at 17.

57.    They told the Court this, then proceeded to do exactly what they claimed they needed not to do.  Debtors did not stop with that rhetoric, however:

> Finally, and most fundamentally, the continued prosecution of Additional Covered Actions against the Covered Non-Debtors would constitute an end-run around the stay, and would create an opportunity for gamesmanship on the part of a small minority of dissenting creditors for the very purpose of adversely affecting the Debtors' reorganization.

D.I. 23, Case 20-50850 at 17.

58.    Indeed, there has been gamesmanship afoot in the District Courts, but it has not been started by Acthar Plaintiffs.  It was started when the Debtors, in violation of court-ordered stays entered in those courts at their request, filed motions without leave attempting to effect transfer of the cases.  It would appear that Debtors engaged in confession through projection[12].  The very thing they claimed to fear is the thing they themselves engaged in.

---

[12] Projection is displacing one's feelings onto a different person. The term is most commonly used to describe defensive projection—attributing one's own unacceptable acts to another.
*Psychology Today*, found 3/17/21 at https://www.psychologytoday.com/us/basics/projection

59.     Thus, the Debtors are using the injunction as both a sword and a shield, inequitably, and for improper purposes.  Equity demands that the injunction be lifted, particularly given the dishonest approach taken to get the injunction in the first place.

### V.     THIS COURT'S RELIANCE ON RECORD TAINT AS A FORM OF IRREPARABLE HARM IS A DENIAL OF DUE PROCESS BECAUSE IRREPARABLE HARM CANNOT BE BASED ON SPECULATION AND CONJECTURE; INJUNCTIONS PROTECT ONLY AGAINST REAL, NOT IMAGINED POTENTIAL FUTURE HARMS

#### a.  DEBTORS' RATIONALE

60.     At the trial of the preliminary injunction, Debtors had no more than a belief that there would be "record taint."  Specifically, they averred as follows:

- Similarly, continued prosecution of the Additional Covered Actions risks record taint and collateral estoppel that numerous courts have held adversely affect debtors' reorganization. See, e.g., *W.R. Grace,* 386 B.R. at 34 (risk of collateral estoppel and record taint "encumbers the estates with additional litigation burdens from which the stay specifically protects them");

- continued prosecution will … (2) create risks of record taint and collateral estoppel given that the focus of every Additional Covered Action is Debtor conduct; and

- *citing* Johns-Manville, 40 B.R. at 224-25 (permanent harm of discovery burdens and record taint)

61.     The problem with each of these three bits of rhetoric is that they are completely devoid of evidence.  Not only did Debtors not put forth a showing that any discovery was then pending that would send Debtors' managers "chasing around the country preparing for [non-stayed litigation]." D.I. 23 at 16 citing *Johns-Manville Corp.*, 40 B.R. 39 (S.D.N.Y. 1984), they failed to rebut the evidence put forth by Acthar Plaintiffs that the discovery in the *Rockford* Action was closing in mere days when Debtors filed for bankruptcy.

#### b.  RECORD TAINT IS UNDEFINED AND INDEFINABLE

20

62.     Despite Acthar Plaintiffs best efforts to find one, there does not appear to be a definition

of the term "record taint" in the case law.  The closest thing that can be found to a definition is that

articulated in *Johns-Manville Corp.*, 40 B.R. 219:

> [O]nce a witness has testified to a fact, or what sounds like a fact, that witness
> may be confronted with his prior testimony under oath in a future proceeding
> directly involving Manville, whether or not Manville was a party to the record on
> which the initial testimony was taken. Once an admission against interest is made,
> under oath or otherwise, by the agent of a party, that admission stands for all time.

*Id*. at 225.

63.     While the *Manville* court was correct in the evidentiary effect of testimony, the question it

fails to answer, and that must be answered is this: why does this matter only in bankruptcy and not

in every other instance where prior admissions are used against a defendant?

64.     Truthful testimony does not "taint" the record.  It merely informs it.  The suggestion of

taint is simply an artful rhetorical device designed to make the truth seem unseemly.  The real

problem is, absent a definition, even this statement about how testimony affects cases is simply an

observation.  It is not a definition of "record taint."

65.     Debtors here introduced not a shred of evidence of what record was imminently likely to

be tainted, how it could be tainted, or what effect that taint might have on the disposition of claims

before this Court.  In short, the potential for "record taint" advanced at the trial of the preliminary

injunction has not manifested, and can never manifest because, simply put, it is merely a rhetorical

construct used to escape the natural and probable consequence of wrongful conduct.

66.     In the *Manville* case it was used to shield Manville's employees from depositions that were

scheduled and certain to occur.  Not so here. The following argument makes this clear.

67.     This Court found that "It would be impossible to proceed against the non-debtor defendants

only without creating significant risk of collateral estoppel and record taint, to the point where the

debtors would need to participate in those actions to protect their interests." (Trans. 11/23/2020 at 50:8-12).

68.    This assertion lacks any evidentiary basis, as set forth above, and reveals flawed legal reasoning, providing yet another basis to vacate the Preliminary Injunction.

69.    As a matter of first impression, no case in the Third Circuit, or in the bankruptcy courts generally, provides a definition of the term "record taint." Instead, courts use it as a rhetorical tarp to cover an amorphous collection of "bad stuff" that might happen to a Debtor if its co-liable co-conspirators were held accountable.

70.    As no court from the Third Circuit has ever defined "record taint," its use to justify jurisdiction in aid of injunctive relief is a violation of due process, which depends on notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

71.    "Parties whose rights are to be affected are entitled to be heard." *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863).

c.   Undefined Record Taint Is A Violation of Fundamental Due Process

72.    Here the issue is notice and its adequacy in describing the elements of deprivation. "Record taint" is an undefined term. Notice is "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality…" *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). *See also Richards v. Jefferson County*, 517 U.S. 793 (1996).

73.    No person has adequate notice where a term of art is used but not defined, and describes only something that might happen later. While notice need not describe the legal procedures

necessary to protect a person's interest if such procedures are otherwise set out in published, generally available public sources, where terms of art are used without definition and where no definition can be found in the case law or public, published sources, that smacks of a denial of due process.

74.     Contrast the assertion of this amorphous "record taint" with the term "collateral estoppel." Lawyers understand what that means because it is defined in case law and its elements are published in numerous cases.  When lawyers debate what is and what is not collateral estoppel, they have signposts along the way to guide them in that evaluation.  Not so when it comes to record taint.

75.     While Debtors have repeatedly asserted the risk of record taint, they have yet to demonstrate in some concrete, evidentiary way how the record in this Court could be tainted by separate proceedings against a separate party in a separately tried action in another forum under the law of that forum.

76.     Reliance on record taint amounts to an unconstitutional violation of due process for the Acthar Plaintiffs because it is undefined and applied in an undisciplined fashion to deny the Acthar Plaintiffs access to their chosen fora in federal and state courts.

### d.   Fear of Harm is Not Evidence of Potential Harm

77.     More importantly, injunctions issue where unusual circumstances exist, not where they *might possibly* exist in the future.  Simply put, a fear of record taint, like a fear of collateral estoppel, is no more than speculation about the future.

78.     The Third Circuit has cautioned against injunctive relief based on speculation for decades:

> The dramatic and drastic power of injunctive force may be unleashed only against
> conditions generating a ***presently existing actual threat***; it may not be used
> simply to eliminate a possibility of a remote future injury, or a future invasion of
> rights, be those rights protected by statute or by the common law.

*Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614 (3rd Cir. 1969).

79.    "Plaintiffs seeking prospective injunctive relief must demonstrate a 'real and immediate threat' of injury in order to satisfy the 'injury in fact' requirement of standing." *Giterman v. Pocono Medical Center*, 361 F.Supp.3d 392 (M.D. Pa. 2019)(in the context of injunctive relief under the ADA);  In order to state a basis for a claim for injunctive relief, the complaint must allege that injury that is 'certainly impending.' " *Phillips v. St. Mary's Medical Center*, 2013 WL 1124372, *2 (E.D. Pa. March 19, 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n. 2, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The injury must be personal, actual and imminent, and cannot be speculative. *Doe v. National Bd. of Medical Examiners*, 199 F.3d 146, 153 (3rd Cir. 1999).  *See also Flowserve Corp. v. Burns Intern. Services Corp.*, 423 F.Supp.2d 433 (2006) ("The relevant inquiry is whether, at the time the injunctive relief is to be issued, the party seeking the injunction is in danger of suffering irreparable harm. ***Speculative injury does not equate with irreparable harm***, …"); *Little v. Mottern*, 2015 Westlaw 5954350 (M.D. Pa.)(possible assault by other inmates); *Dice v. Clinicorp, Inc.*, 887 F.Supp. 803, 809 (W.D. Pa. 1995)("the claimed injury cannot merely be possible, speculative or remote.");  *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (citations omitted)(An injunction is not issued "simply to eliminate the possibility of a remote future injury ...").

80.    Record taint, if it exists at all, represents just that: the remote possibility of a potential future injury, and even that lacks an evidentiary basis in this case.

> Common sense is no substitute for evidence. A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties.

*Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3rd Cir. 2000).

### e.   THERE WAS NEVER AN EXISTING THREAT OF IRREPARABLE HARM

81.   The Third Circuit has repeatedly insisted that the use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter, and the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm. *See, e.g., Campbell Soup Co. v. ConAgra Inc.,* 977 F.2d 86, 91 (3d Cir.1992); *Frank's GMC Truck Center,* 847 F.2d at 102–03.

82.   The Supreme Court, moreover, has instructed that the tool of the preliminary injunction should be reserved for "extraordinary" situations.  *Sampson v. Murray*, 415 U.S. 61, 88, 92 n. 68, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (emphasis added).

83.   It has also previously stated, "[t]he dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat." *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.1969) (emphasis added). See also, e.g., *Wyrough & Loser, Inc. v. Pelmor Labs., Inc.,* 376 F.2d 543, 547 (3d Cir.1967) ("[T]he black letter rule" is that "an injunction is an extraordinary remedy to be granted pendente lite only upon a showing of the likelihood of irreparable harm before the case is resolved on the merits."); *Warner Bros. Pictures v. Gittone,* 110 F.2d 292 (3d Cir.1940) ("We have pointed out frequently that the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.").

84.   For this reason, in addition to the foregoing reasons, this Court should vacate its preliminary injunction.

### VI.   THERE IS NO RISK OF COLLATERAL ESTOPPEL RESULTING FROM PROCEEDING AGAINST EXPRESS SCRIPTS HEALTH, INC. ENTITIES IN THE DISTRICT AND STATE COURTS.

### a.   THERE NO RISK OF COLLATERAL ESTOPPEL

85.     Debtors posited a fear of collateral estoppel as a basis for injunctive relief.  Fear is not a valid basis to enjoin proceedings, as shown above.

86.     To the extent some risk of future risk of collateral estoppel was relied upon for the issuance of the preliminary injunction, that fails because it is remote, speculative, and Debtors have failed to make any evidentiary showing of what issues are even ripe for collateral estoppel, or what form collateral estoppel might take in this case.

87.     The purported harm sought to be prevented has not manifested, requiring this Court to take a fresh look and demand actual evidence of the way in which collateral estoppel could arise and could impact the Debtor's estate.

88.     Collateral estoppel prohibits the relitigation of issues that have been adjudicated in a prior lawsuit. The principles of collateral estoppel apply in discharge proceedings in bankruptcy court. See *Grogan v. Garner*, 498 U.S. 279, 284–85 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991); *In re McNallen*, 62 F.3d 619, 624 (4th Cir.1995). If the prior judgment was rendered by a federal court, bankruptcy courts apply federal principles of collateral estoppel. *See Heiser v. Woodruff*, 327 U.S. 726, 732, 66 S.Ct. 853, 855–56, 90 L.Ed. 970 (1945); see also *Grogan*, 498 U.S. at 284, 111 S.Ct. at 658 (citing RESTATEMENT (SECOND) JUDGMENTS § 27 (1982) as establishing elements of federal collateral estoppel).

89.     As for federal principles of collateral estoppel, the Third Circuit, as set forth in its decisions over the years, has required varying combinations of the following elements to be present in order for collateral estoppel to apply:  (1) The issue sought to be precluded is the same as that decided in the prior action; (2) That issue was actually litigated in the prior action; (3) The resolution of that issue was determined by a valid and final judgment on the merits; (4) The resolution of such issue must have been essential to the prior judgment; (5) The party against whom the bar of

collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (6) The party against whom such bar is asserted had a full and fair opportunity to litigate the issue in question in the prior action. *In re Cowden*, 337 B.R. 512 (W. D. Pa. 2006)(requiring all six elements); *See Temple University v. White*, 941 F.2d 201, 212 (3rd Cir.1991) (listing as necessary elements 1, 3, 5 & 6 set forth above); *Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201, 209 (3rd Cir.2001) (apparently listing elements 1, 2, 4 & 6).

b. No Evidence Supports a Risk of Collateral Estoppel

90.      In spite of these clear principles, Debtors have not identified a single legal issue that could result in issue preclusion through collateral estoppel in this Court.  And, how could they?

91.      First, in order to assert collateral estoppel against the Debtors here, a party would need to show elements that simply cannot be shown on this record.  As this Court knows "(i)njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3rd Cir. 1980).

92..     Since no case involving the Acthar Plaintiffs has gone to trial, or is likely to go trial until 2022 even if the injunction were lifted today, the requirement of a final valid judgment is missing and it is impossible to predict when one might exist.  More importantly, the judgment would not be final absent exhaustion of all post-trial motions and appeals.

93.      Thus, even if a case could get to trial before 2022, it would not be final until long past the point when this Court had terminated this bankruptcy, and no collateral estoppel effect could take place.  But that is not the end of the analysis.

94.      Collateral estoppel principles require that the party against whom the bar of collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.  *Cowden*, 337

B.R. 512. Debtors cannot be a party because all pre-petition litigation against them must occur here, in this Court.

95.     Neither can any of the many Express Scripts entities become "virtual representatives" in privity with Debtors simply because they share similar interests. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 311 (3rd Cir. 2009)("The scope of privity, while largely freed from the very constrictive common law mutuality anchor, remains small.").

96.     In *Taylor v. Sturgell*, 128 S.Ct. 2161 (2008), the Supreme Court reversed a decision by the District of Columbia Circuit adopting the "virtual representative" theory of privity. The Supreme Court stated emphatically that "[w]e disapprove the doctrine of preclusion by 'virtual representation.' " *Id*. Application of a liberal "virtual privity" doctrine would defy the limitations on nonparty preclusion established by the requirement that the party adequately represent the interests of the nonparty. *Id.* Thus, Debtors could not be subject to collateral estoppel because they are neither parties nor in privity with the Express Scripts parties such that a ruling against Express Scripts could bind them.

97.     Third Circuit precedent has been to require a preexisting legal relationship between those contending over privity, before lifting the bar against collateral estoppel. *Nationwide*, 571 F. 3d at 98. For the same reasons, Debtors would not have had a fair and full opportunity to defend in the other action because their status as a party was effectively revoked in all the other courts by virtue of their voluntary bankruptcy filing and transfer to this Court.

99.     For all these reasons, collateral estoppel cannot serve as a basis for finding unusual circumstances (or, for that matter, jurisdiction).

   c.   SPECULATION ABOUT IRREPARABLE HARM IS NOT EVIDENCE OF IRREPARABLE HARM

100.    The risk of irreparable harm must not be speculative. See, e.g., *Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir.1994). *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir.1989) (district court abused its discretion in granting a preliminary injunction when there was no hard evidence that could have led the court to believe that a broken contract would force one party to go out of business); *Marxe v. Jackson,* 833 F.2d 1121 (3d Cir.1987) (district court erred in finding irreparable harm when there was weakly alleged possibility that, in claim of retaliatory discharge, being kept out of the workplace threatened to discourage coworkers from testifying; such a charge could constitute irreparable harm, but more specific facts indicating the existence of such a threat needed to be presented); *United States v. Com. of Pennsylvania*, 533 F.2d 107 (3d Cir.1976) (threatened effect on ability to provide medical care too attenuated to constitute irreparable harm); *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761 (3d Cir.1971) (threatened loss of "theatre momentum" not sufficiently concrete to require Columbia Pictures to deliver promised film before adjudication of meaning of contract).

101.    The bottom line is that establishing the risk of irreparable harm is not enough to support a preliminary injunction. A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (quoting *Continental Group*, 614 F.2d at 359). That showing cannot be maintained any longer by the Debtors and this Court should vacate the injunction.

### d.    UNUSUAL CIRCUMSTANCES DO NOT EXIST

102.    This Court's finding that unusual circumstances have been shown because "debtors would need to participate in those actions to protect their interests," simply does not bear out on the record. Debtors introduced no evidence that shows they would need to participate in the Rockford, Steamfitters Local 420 or Plumber Local 322 Actions in order to protect their interests.

29

103.    Moreover, with respect to, this Court misinterpreted the issues when it cited in its bench ruling a non-existent breach of contract claim in the *Steamfitters Union Local 420* Action

e.    INDEMNITY AS BOTH SWORD AND SHIELD

104.    Debtors have hidden a prior indemnification demand from this Court, misrepresented Express Scripts' ability to execute on indemnity agreements it does not own, have obtained an injunction to get litigation peace and then used that injunction as both a sword and a shield, and further, have wholly failed to correct false testimony given before this tribunal.

WHEREFORE, the Acthar Plaintiffs respectfully request relief from the preliminary injunction to pursue their claims against Express Scripts.

Date:  May 18, 2021
       Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Daniel K. Astin*
Daniel K. Astin (No. 4068)
1204 North King Street
Wilmington, DE  19801
Telephone: (302) 658-1100
Facsimile: (302) 658-1300
dastin@ciardilaw.com

-and-

Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA 19103
Telephone:  (215) 557-3550
Facsimile:  (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Donald E. Haviland, Jr., Esq.
(Admitted *pro hac vice*)

30

*haviland@havilandhughes.com*
William H. Platt II, Esq.
(Admitted *pro hac vice*)
*platt@havilandhughes.com*
**HAVILAND HUGHES**
201 South Maple Ave., Suite 110
Ambler, Pennsylvania 19002
T: 215-609-4661
F: 215-392-4400

-and-

Dion G. Rassias, Esq. (No. 2829)
*dgr@beasleyfirm.com*
Jillian E. Johnston, Esq.
*(Admitted pro hac vice)*
*Jill.johnston@beasleyfirm.com*
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA  19107
T: 215-592-1000

-and-

James Bartimus, Esq.
*(Admitted pro hac vice*)
jb@bflawfirm.com
Anthony DeWitt, Esq.
*(Admitted pro hac vice*)
ALDewitt@bflawfirm.com
**BARTIMUS, FRICKLETON,
ROBERTSON, RADAR PC**
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211
T: 913-266-2300
F: 913-266-2366

-and-

Peter J. Flowers, Esq.
(Admitted *pro hac vice*)
*pjf@meyers-flowers.com*
Jonathan P. Mincieli, Esq.
(Admitted *pro hac vice*)
*jpm@meyers-flowers.com*
**MEYERS & FLOWERS, LLC**

3 North Second Street, Suite 300
St. Charles, Illinois 60174
T: 630-232-6333
F: 630-845-8982

*Counsel for the Acthar Plaintiffs*